**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KIRBY'S SPECTRUM COLLISION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 09-0663-WS-B** |
| | ) | |
| **GOVERNMENT EMPLOYEES INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 77). The Motion has been briefed and is now ripe for disposition.

**I.    Background Facts.**[1]

Plaintiff, Kirby's Spectrum Collision, Inc. ("Spectrum"), brought this action against defendant, Government Employees Insurance Company ("GEICO"), pursuing state-law claims of intentional interference with contractual/business relations and injunctive relief.[2] The allegations and legal theories at issue in this action have shifted over time (thanks to discovery revelations and the parties' proactive efforts to narrow their dispute via settlement of various

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in its favor.

[2]    Spectrum initially filed this action in state court; however, GEICO removed it to this District Court. Federal jurisdiction was predicated on 28 U.S.C. § 1332. The parties are of diverse citizenship; moreover, the $75,000 jurisdictional threshold appears satisfied given the parties' concurrence that the amount in controversy exceeds that amount, and the nature of damages claimed by Spectrum (*i.e.*, past and future lost income relating to contracts or business relations for repair of customer vehicles that defendant is "steering" away from plaintiff's shop).

portions), rendering plaintiff's claims something of a moving target. However, the parties are in agreement that this litigation now centers on the legality of GEICO's Automobile Repair Xpress Program (the "ARX Program") insofar as it affects Spectrum's contractual and business relationships with its customers.[3] The Court therefore need not and will not wade into now-extraneous allegations concerning the genesis of the bad blood between the parties, Spectrum's billing practices, GEICO's limits on paint and materials reimbursements, the parties' heated face-to-face confrontations, and alleged disparaging remarks by GEICO representatives about Spectrum, except insofar as such facts provide helpful context or background for the issues now in play.

### A. The ARX Program in Theory.

Spectrum is an automobile collision center / repair shop located in Mobile, Alabama. GEICO is an automobile insurance provider that issues policies to cover certain vehicle repair claims for and on behalf of its insureds. In approximately 2005 or 2006, GEICO launched its ARX Program in the Mobile market. (Gaskin Dep., at 47; Garner Dep., at 161-62; Jackson Dep., at 61.) Internal GEICO documents describe the ARX Program as one "which delivers the convenience of one stop claim handling, the efficiency of priority repairs, and peace of mind knowing that GEICO guarantees the repairs for as long as the customer owns the vehicle." (Pl. Exh. 23, at 11.) In implementing the ARX Program in this area, GEICO designated a single repair shop (non-party Cockrell's Body Shop on the I-65 Beltline) as the only ARX facility in Mobile. (Gaskin Dep., at 47, 49-50; Garner Dep., at 73-74, 78, 80, 161.) GEICO arranged for one of its adjusters to be stationed full-time at the Cockrell's location to inspect GEICO customers' vehicles, for estimates to be prepared on-site, and for rental cars to be readily available at that location to accommodate GEICO customers. (Stringfellow Dep., at 44-46; Garner Dep., at 78-79.)

---

[3] In plaintiff's words, "Spectrum's remaining claims against Geico focus on the ARX program utilized by Geico to interfere with both the contractual and business relationships between Spectrum and its customers." (Doc. 92, at 3.) Similarly, defendant's position is that Spectrum "bases its allegations of interference with contractual or business relationships … on GEICO's ARX Program …." (Doc. 101, at 3 (internal quotation marks omitted).) Thus, both sides concur that, as presently postured, Spectrum's claims key on the ARX program, rather than unpaid or disputed bills, paint and materials caps, or alleged derogatory remarks.

With this infrastructure in place, the way the ARX Program is designed to work is as follows:  If a Mobile-area GEICO customer (whether an insured or a third party whose vehicle was damaged by a GIECO insured) makes a claim for a damaged but drivable vehicle, GEICO directs the customer to take the car to Cockrell's (the designated ARX shop) for GEICO's adjuster to inspect it and prepare an estimate.  (Garner Dep., at 72.)[4]  Plaintiff's evidence is that this "drive-by" requirement is unique to GEICO, in that other insurance companies do not mandate that customers go to a competitor's shop for inspection.  (D. Kirby Dep., at 439-40.)  In any event, upon the vehicle's arrival at Cockrell's, the GEICO adjuster meets with the customer, inspects the vehicle, and explains the benefits of the ARX Program.  If the customer elects to allow Cockrell's to complete the repairs, then the customer leaves the car there, picks up a rental car from an on-site rental agency, and departs.  If, however, the customer elects to have another body shop perform the repairs, then the customer may take the vehicle to that shop.  Even if the customer knows from the outset that she wants a non-ARX shop to perform the repairs, she is generally required to bring her vehicle (so long as it can be safely driven) to Cockrell's for the inspection and meeting with the adjuster, and then return it to her shop of choice to complete the repairs.  (Gaskin Dep., at 79; Jackson Dep., at 55.)

In GEICO's view, having an adjuster on-site at its Mobile ARX location makes GEICO more efficient in providing services at lower cost,[5] and should improve customer service by

---

[4]     GEICO witnesses explained that if a customer resists bringing a drivable vehicle to the ARX shop for inspection, then GEICO "will have the adjustor come to them.  That's the process.  They don't have to do anything."  (Jackson Dep., at 98-99; *see also* Garner Dep., at 74-75, 102; Thomas Dep., at 30-32.)  Therefore, GEICO does not contemplate that the requirement that customers bring their vehicle to Cockrell's for inspection is ironclad, or that coverage will be refused if they fail to do so; rather, in that event, GEICO would perform a field inspection at the vehicle's location, without forcing the customer to bring the car to the designated ARX facility.  As one witness put it, if customers do not want to take their car to Cockrell's for inspection, then "what we would do is have an adjustor meet them or go to their place of employment, their home or body shop where they want their vehicle located to inspect the damages."  (Jackson Dep., at 88.)  GEICO's policy is that its customer service representatives "cannot require that a customer go anywhere."  (Thomas Dep., at 32.)

[5]     Requiring the customer to bring the damaged vehicle to the adjuster at Cockrell's saves GEICO the expense and time of dispatching adjusters all over town to inspect covered vehicles.  (Garner Dep., at 77-78.)  And from the customer's perspective, there should be little tangible difference between bringing the vehicle to Cockrell's for an adjuster inspection and bringing it to some other fixed location designated by the insurer.  (*Id.* at 98-99.)

minimizing customer headaches and inconvenience in the claims process. (Garner Dep., at 204.)[6] The idea is that the ARX Program provides a kind of "one-stop shop" where the customer can meet with an adjuster, have an estimate prepared, leave the car for repairs, and pick up a rental car, all in a single location. (Gaskin Dep., at 76.) At the ARX shop, the GEICO customer receives priority treatment, which GEICO does not provide at non-ARX shops. (Jackson Dep., at 64, 77.) Another benefit of the program is that ARX shop repairs are guaranteed for as long as the customer owns the vehicle, but GEICO provides no such guarantee for other shops' repairs. (*Id.* at 64, 68-70.) Thus, GEICO does not provide any warranty for repairs performed by Spectrum. (Stringfellow Dep., at 35.) And at the ARX shop, unlike non-ARX locations, a GEICO adjuster is present throughout the repair process to oversee the work, address problems as they arise, and act as a liaison between the customer and the collision center. (Jackson Dep., at 64-65.)

GEICO believes its ARX Program adds value for its customers; therefore, the company endeavors to educate them about that program so that customers can understand their options and make an informed decision. (Garner Dep., at 209-11.)[7] That said, GEICO agrees that, while it is appropriate to apprise its customers of the ARX Program and to encourage them to avail themselves of its benefits, it is not appropriate to "steer" customers away from other shops or to "unduly pressure[]" them to choose the ARX shop for repairs. (*Id.* at 150-51; Thomas Dep., at 37-38.)[8] GEICO agrees that its customers have an absolute right to select the repair shop of their

---

[6]     In this regard, GEICO customers using the ARX Program should receive superior service because GEICO does "a better job of keeping them informed and overseeing the repair to head off any problem, to try to be their advocate." (Garner Dep., at 81.) And the ARX Program should bolster customer convenience because the customer can "just take [the damaged vehicle] to a shop where they can just leave it there and have us take care of it for them so they don't have to worry about that." (Jackson Dep., at 101.)

[7]     Record evidence establishes that in GEICO's experience, "[o]nly … about thirty to forty percent of our customers accept and want to use the ARX program." (Garner Dep., at 162.) So GEICO attempts to educate its customers about the benefits of that program in hopes of raising those percentages and increasing utilization.

[8]     As one GEICO official explained, "You should not try to pressure them. However, we do have a responsibility I think to educate them of what their options are." (Garner Dep., at 66.) In GEICO's view, "it would be wrong" to tell customers that they had to have their vehicle repaired at the ARX shop rather than at a facility of the customer's choosing. (*Id.* at 63.)

choice, and that GEICO should not dictate that shop to customers or pressure them to use a particular shop. (Garner Dep., at 65; Thomas Dep., at 36; Gaskin Dep., at 72.) GEICO customer service representatives are instructed to "offer[] the ARX program to the customer after advising them that they can use the shop of their choice. They can't make the customer go." (Jackson Dep., at 102-03.) Should a customer state that she has decided that she wants her car repaired at another location, after being apprised of the benefits of the ARX Program, then GEICO representatives should honor that request. (Gaskin Dep., at 73-74.)[9] Thus, according to GEICO, "[i]f they have heard about what our ARX process was and they said no, I want to go to Kirby's Spectrum, absolutely the vehicle should go to Kirby's Spectrum Collision." (Garner Dep., at 85.)

The metrics by which GEICO evaluates its customer service representatives include their "capture" rate for ARX opportunities, meaning the frequency with which they succeed in persuading customers to have their cars inspected at an ARX shop, and their "retention" rate, meaning the frequency with which those customers agree to have repairs done via the ARX Program. (Jackson Dep., at 38-41.) As a result, GEICO call center employees have a direct interest in encouraging customers to use the ARX Program and in emphasizing the benefits of that program, in hopes of improving their personal capture and retention rates.[10]

---

[9]     One GEICO witness stated that the dialogue should proceed as follows: "If they come in and say, Well, you know, I think I'm going to have it repaired over here, that's fine. You have your right to have your car repaired wherever you want to have it repaired. I'd like to just mention the benefits of our ARX program. And again, if they say, No, I want to have it there, then fine. Let's arrange – get your estimate to you. You can take it to where you would like to have it repaired." (Gaskin Dep., at 75.) Similarly, during the initial call by the customer to make a claim, if the customer indicates that she has chosen an independent shop, GEICO customer representatives should respond as follows: "Of course, you have the right to use the body shop of your choice, but we do want to advise you of an opportunity you have in your area" (Jackson Dep., at 54) and then tell them about the ARX Program. Thus, GEICO expects its representatives "to offer and explain the benefits of the program. It's up to the customer if they want to accept it or not." (*Id.* at 74.)

[10]     Internal GEICO documents confirm the company's emphasis on its ARX Program in training its employees. For example, training documents show that when a customer objects to the ARX Program, the GEICO employee should, among other things, "[a]sk for the sale, again." (Pl. Exh. 21.) GEICO tells its employees that the ARX Program will lead to excellent service, which will help it retain customers, which will benefit employees through profit-sharing. (Pl. Exh. 23.) But those documents also confirm that if a customer indicates that he has arranged
(Continued)

**B.** **_The ARX Program in Practice._**

Spectrum maintains that GEICO's ARX Program is unique in the auto insurance business. To be sure, plaintiff acknowledges that many insurers have implemented preferred shop arrangements, and that it participates in such programs; however, it insists that GEICO's arrangement is qualitatively different than those of other carriers. (Doc. 92, at 2-3, 17; J. Kirby Dep., at 276.) The critical aspect of the ARX Program to which Spectrum objects is the notion that GEICO compels customers to bring their vehicles to the ARX shop (Cockrell's) for inspection by a GEICO adjuster (who makes a hard sell to encourage the customer to allow Cockrell's to repair the car), rather than allowing vehicles to be examined at a neutral location or via field inspection. (Doc. 92, at 11.) Plaintiff's position is that other insurers with drive-by programs allow field inspections upon request, but that GEICO does not. (D. Kirby Dep., at 436, 439-40.) Of course, GEICO's evidence is that the ARX Program specifically provides for field inspections upon request, in lieu of the customer bringing the vehicle to Cockrell's; however, plaintiff's summary judgment evidence is that the program has not, in fact, functioned in that manner in practice.

---

for another body shop to perform the work, then the GEICO representative should set up a field inspection, not force the customer to visit the ARX shop. (Pl. Exh. 22, ¶¶ 2, 5.) GEICO documents also confirm that its employees must inform customers that they have the right to use the body shop of their choice. (_Id._ at 1.) And the written materials expressly remind GEICO employees that "[i]t is unethical to misrepresent a scenario or customer's situation to manipulate your [ARX] results. You must give the customer all necessary information so that they can make an educated decision." (Pl. Exh. 23, at 2.) These types of statements are consistent with GEICO witnesses' explanation of how the program is intended to function, and go a long way towards dispelling the sinister inference that Spectrum ascribes to GEICO's training materials. Similarly, while Spectrum makes much of a GEICO statement that adjusters attempt to "convert" customers to the ARX Program when they bring their vehicles by for inspection (Pl. Exh. 25, at 2), the mere fact that GEICO adjusters encourage drive-by customers to consider the ARX Program is not, in and of itself, nefarious or improper. GEICO's consistent position is that the ARX Program is beneficial to its customers; indeed, its documents show that "customer service survey results are 10% higher when customers use the [ARX] Program." (Pl. Exh. 29.) As a business wanting for pragmatic purposes to keep its customers happy, and knowing that the ARX Program is positively correlated to customer satisfaction, GEICO would be foolish not to ask its employees to educate and encourage customers -- at appropriate junctures via appropriate methodologies -- to avail themselves of those benefits.

Notwithstanding GEICO's insistence that customer choice and satisfaction are paramount virtues of the ARX Program, there is evidence that its customers have been intimidated or strong-armed into hauling damaged vehicles to the ARX shop.  In that regard, the record contains testimony and affidavits from a number of GEICO customers concerning their experiences with the ARX Program, as it relates to the inspection or repair of their vehicles. This evidence, like all other exhibits in the summary judgment record, is construed in the light most favorable to the non-movant, Spectrum.  It is Spectrum's position that these customer testimonials demonstrate that GEICO was in fact steering customers away from Spectrum and to the ARX shop, notwithstanding nominal policies to the contrary.

In particular, Spectrum identifies two individuals whom it contends GEICO misled or bullied into having repairs performed at Cockrell's rather than at Spectrum.  First, customer Kimberly Brown indicates that when she phoned in her claim to GEICO and said that she wanted Spectrum to repair her vehicle, the GEICO representative responded that "our insurance adjuster's at Cockrell's and … we send all of our claims to Cockrell's."  (Brown Dep., at 11.) According to Brown, she told the GEICO representative repeatedly that she wanted Spectrum to perform the repairs and that she did not want to use Cockrell's because of a previous bad experience there.  (*Id.* at 12-15.)  Brown indicated that she "finally … just gave up" because the rep said that Cockrell's was "where GEICO did all their repairs."  (*Id.*)[11]  Brown reluctantly agreed to have her car towed to Cockrell's and subsequently allowed Cockrell's to repair it.  (*Id.*

---

[11]     GEICO offers excerpts of the deposition of Mindy Miller, the GEICO representative with whom Brown spoke, to counter Brown's allegations.  Miller testified that she would "[a]bsolutely" honor a customer's statement that she did not want to take her vehicle to Cockrell's for inspection.  (Miller Dep., at 29.)  As Miller put it, "We don't require them to drive it to Cockrell's to have it inspected."  (*Id.* at 31.)  But Miller clarified her testimony to indicate that GEICO does require customers to take their vehicles to "an inspection location" (which could be either an ARX shop or another body shop where a GEICO adjuster was), after which "they may go to any shop they want to have their repair."  (*Id.* at 34, 36.)  Miller indicated that in her conversation with Brown, Miller explained the ARX Program and said that Cockrell's was the closest ARX shop.  (*Id.* at 40.)  When Brown responded that she did not wish to go to Cockrell's, Miller offered to make alternative arrangements, but Brown said, "No, no, it will be okay.  I'll use that one."  (*Id.* at 41.)  Miller stated that Brown "[n]ever, never" mentioned her desire to use Spectrum.  (*Id.* at 42.)  Of course, for summary judgment purposes, the record is considered in the light most favorable to the non-movant.  Accordingly, to the extent that Brown's and Miller's accounts of their conversation diverge, the Court credits Brown's version for purposes of the Rule 56 analysis.

at 15, 66, 69.)  At that time, Brown had not had any contact with Spectrum about repairing her vehicle, and had signed no documents with Spectrum relating to that repair.  (*Id.* at 66.)  Second, James Deas asserts that in discussing his need for vehicle repairs with a GEICO representative, he "felt like [he] did not have a choice as to where the repair to [his] vehicle would be done," and that he was told that he "had to bring [his] truck to Cockrell's to have it fixed."  (Deas Aff., at 2.)  On the basis of the GEICO representative's statements that GEICO-insured repairs must be done at Cockrell's, Deas took his vehicle to Cockrell's for repairs.  (*Id.*)  Deas does not allege, however, that he ever entered into an agreement with Spectrum concerning those repairs, or that he ever told GEICO that he wanted Spectrum to do the work.

Spectrum also offers evidence that other customers were encouraged or compelled by GEICO to take their vehicles to Cockrell's for inspection, even though Cockrell's did not ultimately perform the repairs.  For example, a customer named Robert Byrne said that he had his vehicle at Spectrum awaiting repairs when a GEICO representative informed him that "repairs couldn't start until the vehicle was inspected by … Cockrell's Body Shop on I-65.  We had to go in, we had to have it inspected."  (Byrne Dep., at 77.)  Byrne pleaded with the representative to be exempted from that requirement and did not wish to take his vehicle to Cockrell's, but the GEIO representative was "[t]otally inflexible" and never offered him a field inspection at Spectrum.  (*Id.* at 78.)  Over his strenuous objection, Byrne arranged for his damaged car to be moved to Cockrell's for the inspection, then returned it to Spectrum for repairs.  (*Id.* at 61-62.)[12]  In that same vein, a witness named John Waldrop testified that he explained to a GEICO representative that he did not want to go to Cockrell's, but that GEICO insisted that he take the car to Cockrell's and offered him no other alternatives.  (Waldrop Dep., at 81-82.)  Waldrop states that he "verbally battled back and forth" with the GEICO rep for several minutes, but that GEICO never backed off its demands that he take the vehicle to Cockrell's.  (*Id.* at 82.)  There is no evidence that Waldrop's repairs were performed anywhere other than the shop of his choosing.

---

[12]     Byrne denied having any information that GEICO or Cockrell's attempted to siphon away Spectrum's business by pushing to have Byrne's car left at Cockrell's for repairs.  (*Id.* at 65.)  In fact, even as GEICO was instructing Byrne to take his vehicle to Cockrell's for an estimate, the GEICO representative "assured [him] that [he] could have [his] car repaired anywhere."  (*Id.* at 71.)

Yet another witness, Denise Cobb, contends that the GEICO adjuster at Cockrell's was "real persistent" that she should allow Cockrell's to repair her vehicle even after she had stated her desire to use Spectrum. (Cobb Dep., at 10.)[13]  In Cobb's view, the GEICO adjuster's conduct "was a little intimidating." (*Id.* at 15.)  Cobb added that even before she brought her car to Cockrell's, she told a GEICO representative that she had selected Spectrum, but that GEICO indicated that she "had to show up at the Cockrell location for an estimate because that's where their building was located and the adjustor was located." (*Id.* at 12.)  Cobb's vehicle was ultimately repaired at Spectrum, in accordance with her wishes. (*Id.* at 17.)  Likewise, witness Melvin Boggan testified to feeling that "[p]sychologically," the fact that GEICO's adjuster was based at Cockrell's made him feel pressure to have the repairs performed there. (Boggan Dep., at 17-18.)  Boggan felt that GEICO wanted him to stay at Cockrell's for the repairs, but he refused, after which the GEICO adjuster became "aggravated" with him. (*Id.* at 18)  Boggan agreed, however, that the GEICO adjuster did alert him that "you've got a choice to carry it where you want to" for repairs. (*Id.* at 14.)  Finally, witness Anthony Jones asserts that after he contacted Spectrum to repair his damaged business truck, a GEICO representative pushed him to allow Cockrell's to perform the repairs, despite Jones' statement that he did not want Cockrell's to do the work and had already contacted Spectrum. (Jones Aff., at 2.)  Jones was left with the impression that he was not free to select the repair location and that GEICO might not pay the bill if Spectrum did the work. (*Id.*)  Unfazed, Jones nonetheless had Spectrum perform the repairs. (*Id.*)

Despite this parade of witnesses, Spectrum offers evidence of an alleged contractual relationship with respect to only two.[14]  In particular, Spectrum submits copies of work

---

[13]     Cobb elaborated that her desire to use Spectrum stemmed from her "[v]ery close business relationship" with them, such that "if anything needed repairs, that's the only place we took our automobiles to." (Cobb Dep., at 11.)  According to Cobb, the GEICO adjuster spoke ill of Spectrum's work, saying that they did not do quality repairs. (*Id.* at 16.)

[14]     Plaintiff admits that witnesses Brown and Deas did not sign Spectrum work authorization forms prior to their vehicles being repaired at Cockrell's pursuant to the ARX Program. (D. Kirby Dep., at 413-14, 434.)  More generally, plaintiff concedes that it does not obtain work authorizations from all customers because "[s]ometimes we just forget." (*Id.* at 434.)

authorization forms signed by Byrne and Boggan.[15]  Spectrum has the customer execute a work authorization before working on the vehicle, and subjectively views the work authorization as evidencing an agreement between it and its customer.  (D. Kirby Dep., at 407-08.)  That said, Spectrum's work authorization form reads more like a release/waiver/disclosure form than a contract for services.  In particular, the form merely includes statements that the customer (i) authorizes Spectrum to perform repairs and operate the vehicle for purposes of testing or inspecting; (ii) acknowledges Spectrum's mechanic's lien to secure the amount of repairs; and (iii) recites Spectrum's disclaimers of liability for delay or loss.  (Pl. Exh. 20.)  Neither the customer nor Spectrum promises via the work authorization form to do or not to do anything.

As to Byrne, the signed work authorization form and other paperwork reflect that he granted Spectrum permission to perform repair work on his 2000 Honda CRV on an unspecified date, that the repairs were completed on January 20, 2010, and that Spectrum received more than $3,600 from GEICO for the project.  (*Id.*)  Boggan's work authorization form is blank except for his signature, but appears to reflect that he authorized Spectrum to perform repair work on a 2001 Chevy Tahoe on October 1, 2007, that the repairs were completed on October 9, 2007, and that Spectrum received more than $2,000 from GEICO for that project.  (*Id.*)  Nothing in these exhibits indicates <u>when</u> Byrne and Boggan signed those work authorizations relative to their dealings with GEICO or drive-by inspections at Cockrell's; however, the exhibits do confirm that Spectrum in fact repaired both witnesses' vehicles and that GEICO paid Spectrum for those insured repairs.[16]  For these and other GEICO-insured repairs completed by Spectrum, the customer was either a GEICO insured or the victim of a GEICO insured, and GEICO paid Spectrum's bill.  (D. Kirby Dep., at 414.)

---

[15]    Plaintiff also submits a work authorization signed by a person named Timothy Green in connection with a claim that was apparently paid by Alfa.  (Pl. Exh. 20.)  Plaintiff does not explain who Green is, what dealings Green had with GEICO concerning its ARX Program, or the relevance of his paperwork to any issues joined herein.

[16]    Spectrum acknowledges that it cannot identify a single customer who signed a work authorization for Spectrum, went to Cockrell's for an estimate under the ARX Program, and then failed to return to Spectrum for repairs.  (D. Kirby Dep., at 435-36.)  There is no evidence that such a scenario has ever occurred.

### C.    Effects of GEICO's ARX Program on Spectrum.

Plaintiff maintains that GEICO began using its ARX Program to choke off GEICO-insured business at Spectrum in 2007, in the wake of strident disagreements between Darrell DeSpain, who was GEICO's auto damage supervisor in the Mobile market, and Spectrum principals John and David Kirby.  During one such conversation, DeSpain angrily told David Kirby, "[S]ee if you get any more of GEICO work."  (D. Kirby Dep., at 39.)  Another time, DeSpain and John Kirby became embroiled in a verbal altercation that nearly turned physical, with DeSpain vowing that Spectrum "wouldn't get any more work from GEICO."  (J. Kirby Dep., at 127.)[17]  Spectrum's theory in this lawsuit is that GEICO's "threats against its business were not hollow, but made in recognition of" the ARX Program.  (Doc. 92, at 2.)  Plaintiff's briefs assert that "[t]he ARX program is designed to efficiently, and with stealth, take away Spectrum's Geico insured business … in the year after Geico's threats."  (*Id.*)  In other words, Spectrum maintains that the ARX Program is essentially the manifestation and realization of DeSpain's 2007 threats to cease GEICO business for Spectrum.[18]

Empirical evidence lends at least superficial support to Spectrum's contention.  Indeed, data presented by Spectrum reflect that its volume of GEICO-insured repairs declined from more

---

[17]    These conflicts between DeSpain and the Kirbys appear in large part to have instigated this litigation.  DeSpain has since apologized for his comments, and Spectrum has dropped its causes of action against DeSpain; however, Spectrum's residual claims against GEICO remain.

[18]    Such a theory is somewhat perplexing for several reasons.  First, it is undisputed that GEICO commenced its ARX Program in the Mobile market, and designated Cockrell's as the ARX shop, at least a year before the alleged threats were made.  (*See* doc. 92, at 6 ¶ 7.)  It is thus chronologically backward for plaintiff to maintain that GEICO implemented the ARX Program in Mobile to punish Spectrum in accordance with DeSpain's ill-chosen remarks of August 2007.  Second, as shown *infra*, record data reflects that Spectrum's volume of GEICO-paid business today is of a similar magnitude to that preceding the purported threats.  Third, John Kirby admitted that Spectrum "never got any GEICO business anyway" (J. Kirby Dep., at 414), even before the threats.  As he put it, "GEICO, in my whole history, never so much as sent me anything, none of them."  (*Id.*)  If, as Spectrum maintains, GEICO never gave plaintiff business to begin with, it is difficult to surmise how Spectrum believes that GEICO cut off a nonexistent flow of work.

than $88,000 in 2006 and more than $75,000 in 2007 to just $15,379.88 in 2008. (Pl. Exh. 18.)[19] By all appearances, however, Spectrum's volume of GEICO business rebounded considerably thereafter, and appears to be near pre-threat levels at this time.[20]

## II. Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-*

---

[19] Interestingly, Spectrum also experienced sizeable declines in payments from various other insurers from 2007 to 2008, including a drop of $35,000+ from Alfa, a more than $20,000 reduction from Nationwide, and a $13,000 decline from AIG. (D. Kirby Dep., at 321-22, 351-52, 363.) Plaintiff does not attribute any of these reductions to GEICO or its ARX Program.

[20] Plaintiff does not aid its cause on summary judgment by submitting tables such as Exhibits 18 & 19, without explanatory verbiage or evidentiary explanations, leaving the Court to flail through the murky (and sometimes difficult to read) exhibits to construe their meaning. Plaintiff's Exhibit 19 is virtually useless because the copy quality is so poor as to be nearly illegible, and plaintiff omits any cogent explanation of the figures on that table. If anything, Exhibit 19 appears to undercut plaintiff's position, inasmuch as it appears to reflect that Spectrum's GEICO business in 2009 ($55,986) and 2010 ($43,598 as of some undisclosed cutoff date earlier this year) has been commensurate with that of 2007 ($61,584), or so it appears to this Court without any elaboration from plaintiff. (Pl. Exh. 19, at 8.) Based on plaintiff's own exhibits, then, any suggestion that it suffered a long-term diminution in GEICO business beginning in late 2007 or early 2008 as a result of the ARX Program (which, again, went into effect in the Mobile area much earlier) appears to conflict with the facts.

*Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.  Analysis.

As noted, Spectrum's only remaining substantive causes of action against GEICO sound in theories of tortious interference with contractual or business relations.  Under Alabama law, these are separate and distinct torts that must be analyzed independently.  *See White Sands Group, L.L.C. v. PRS II, LLC*, 998 So.2d 1042, 1054 (Ala. 2008) ("*White Sands I*") ("It is widely recognized that tortious interference with a contractual relationship is a claim separate and distinct from interference with a business relationship or expectancy.").  GEICO now seeks summary judgment on these claims, arguing that the record cannot sustain essential elements of each.  GEICO also maintains that inadequacies of proof as to the tortious interference claims are likewise fatal to Spectrum's derivative cause of action for injunctive relief.

### A.  *Tortious Interference with Contractual Relations.*

With respect to Spectrum's claim for tortious interference with contractual relations, GEICO raises a threshold objection that there is no evidence of any contracts.  Defendant is correct that "[a] claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract."  *White Sands I*, 998 So.2d at 1054; *see also Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So.2d 1328, 1329 (Ala. 1993) (affirming entry of summary judgment for defendant on claim of intentional interference with a contract "because there was no contractual relationship to be interfered with").  Spectrum counters that the work authorizations signed by Byrne and Boggan are contracts, but does not explain how these open-ended, non-specific documents (which appear to be in the nature of acknowledgments or disclosures) constitute valid and enforceable contracts under Alabama law.  *See generally White Sands I*, 998 So.2d at 1051 (no contract formation "unless the terms of the contract are reasonably certain," in that "they provide a basis for determining the existence of a breach and for giving an appropriate remedy") (citations omitted).  In the Spectrum work authorization forms, Byrne and Boggan did not promise to do or refrain from doing anything; rather, they simply acknowledged that Spectrum can perform repair work on the vehicle and operate the vehicle for testing purposes, that Spectrum will have a mechanic's lien, and that Spectrum

disclaims responsibility for certain loss or damage. Under the circumstances, it is difficult to see how this document meets the legal definition of an enforceable contract; certainly, Spectrum has made no attempt in its lengthy summary judgment brief to develop such an argument, beyond its unhelpful conclusory statement that these work authorization forms "are contractual relationships for repair of the vehicles involved." (Doc. 92, at 19-20.)

Assuming (without deciding) that the Byrne and Boggan work authorizations are in fact enforceable contracts as needed to establish a claim for tortious interference with contractual relations, the Court agrees with GEICO that Spectrum's cause of action still fails as a matter of law. Simply put, there is no evidence that GEICO had knowledge of any such contractual relationships at the time of the alleged interference, or that any interference took place. In addition to establishing the existence of a valid contract, a plaintiff proceeding on a tortious interference with contractual relations claim under Alabama law must show, *inter alia*, "the defendant's knowledge of the contract" and "intentional interference with the contract." *MAC East, LLC v. Shoney's*, 535 F.3d 1293, 1297 (11th Cir. 2008). Plaintiff has done neither. Despite GEICO expressly questioning the knowledge element on summary judgment (doc. 78, at 27), Spectrum identifies not a shred of evidence which might support a reasonable inference that GEICO knew Byrne and Boggan had signed work authorization forms for Spectrum's benefit before it required them to take their vehicles to the ARX shop for inspection. Certainly, Byrne and Boggan do not say that they notified GEICO of any signed contract with Spectrum, and no other record evidence suggests that they did. Without knowledge of those purported contracts, GEICO could not interfere with them in a manner that gives rise to Alabama tort liability. *See, e.g., Waddell & Reed Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1153 (Ala. 2003) ("to establish tortious interference with contractual or business relations a plaintiff must prove … the defendant's knowledge of the contract or business relation"); *Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1023, 1025 (5th Cir. 1978) ("a plaintiff may not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing").

To meet its burden of showing knowledge, plaintiff offers a sleight of hand by stating in the vaguest of terms that "Geico's asserted lack of knowledge ignores the evidence and is not based upon undisputed facts." (Doc. 92, at 21.) Such a cursory statement is wholly inadequate to meet Spectrum's burden on summary judgment of identifying facts that might support a

reasonable inference that GEICO knew of Byrne and Boggan's work authorizations.[21]  Besides, nothing in this record would support an inference that GEICO improperly interfered with any contractual relations that did exist as between Byrne and Boggan, on the one hand, and Spectrum, on the other.  In both cases, Spectrum actually performed and was paid for the repair work on those vehicles, and the ARX shop did not work on them.  Plaintiff fails to explain, and the Court fails to see, how GEICO's instruction that Byrne and Boggan take their vehicles to an ARX shop for inspection, without more, constitutes tortious interference with Spectrum's purported contractual relations with them.[22]  Indeed, both Byrne and Boggan testified that, while GEICO was inflexible about the inspection requirement, GEICO assured them that they were free to have their vehicles repaired anywhere.  This is not the stuff of improper interference, even assuming that (a) an enforceable contract between customer and Spectrum existed, and (b) GEICO knew of such contracts.[23]

---

[21]      In fact, taking the analysis one step further, Spectrum has not even presented evidence that those work authorization forms were signed prior to the alleged interfering communications by GEICO.  Stated differently, Spectrum has offered no evidence that Boggan and Byrne executed the so-called contracts before GEICO spoke with them about taking their vehicles to Cockrell's.  Record evidence suggests otherwise.  Indeed, GEICO prepared an estimate for Boggan's vehicle at the ARX shop on September 27, 2007, but he did not sign a work authorization in Spectrum's favor until four days later.  (Pl. Exh. 20; doc. 101, Exh. G.)  A defendant cannot know of a contractual relationship (much less interfere with it) if no contractual relationship exists at the time of the alleged interference.

[22]      See generally Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1122-23 (10th Cir. 2008) (insurer did not wrongfully interfere with auto glass shop's business relations where plaintiff could not show knowing misrepresentations to insureds, and reimbursement rates paid by insurer for windshield crack repair were legitimate business practice in competitive insurance market); Ben's Auto Body, Inc. v. Progressive Direct Ins. Co., 2009 WL 5174741, *4 (D.N.H. Dec. 18, 2009) (insurer did not improperly interfere with body shop's business relationships where it did not tell customers they were prohibited from having plaintiff repair their vehicles, but indicated that insurer might not pay full cost of repairs at plaintiff's shop); Glass Service Co. v. State Farm Mut. Auto. Ins. Co., 530 N.W.2d 867, 871-72 (Minn.App. 1995) (no wrongful interference by insurer who informed customers that they may bear responsibility for excess charges by auto glass shop plaintiff).

[23]      Recall that the only identifiable business Spectrum claims to have lost because of GEICO's alleged interference is the repair work for Brown and Deas.  There is no evidence that Brown or Deas ever signed a work authorization form with Spectrum or otherwise entered into a valid, enforceable contract with Spectrum to repair their vehicles at any time before GEICO communicated with them and the ARX shop performed the repairs.  As such, Brown and Deas (Continued)

Perhaps recognizing the futility of pinning its tortious interference with contractual relations claim on the experiences of Byrne and Boggan, Spectrum attempts to extrapolate beyond those two individuals.  In that regard, Spectrum insists that "[w]hat happened to Robert Byrne and Melvin Boggan is not isolated" (doc. 92, at 20), and cites evidence that GEICO has requested or demanded that other customers move their vehicles from a chosen repair shop to the designated ARX facility for inspection before moving back for repairs.  But this evidence does nothing to show the existence of contractual relations between Spectrum and its customers, GEICO's knowledge of any such contracts, or any intentional interference with same.  Besides, to the extent that Spectrum wishes to fall back on general practices (rather than the experiences of specific customers), its own exhibits refute that claim by confirming that GEICO trains its personnel <u>not</u> to interfere with any signed contracts between customers and non-ARX repair shops.[24]

---

cannot bolster Spectrum's tortious interference with contractual relations claim because, as to those individuals, there was no contract with which defendant could have interfered.  And none of the other customers identified by Spectrum abandoned Spectrum based on GEICO pressure; therefore, there can be no improper interference as to them either, even assuming that they did sign work authorization forms (and that GEICO was aware of same) before GEICO spoke with them, because Spectrum ultimately performed the repair work.

[24]    In particular, a Spectrum exhibit entitled "ARX Training Appendix:  Common Auto Repair Xpress Concerns" includes a passage with the heading: "Customer defaults to a shop simply because they had their vehicle repaired there in the past."  In that event, training materials instruct the GEICO representative to ask, "Have you signed any paperwork indicating your intention to have your vehicle repaired at this auto body shop?"  The materials continue, "If the answer is Yes – Set-up a field inspection."  (Pl. Exh. 22, at 1.)  Elsewhere in the same document, GEICO trains its employees that if a customer indicates that arrangements have already been made for another dealer to perform the repairs, the employee must "**STOP!**" and "Set up an alternative inspection type."  (*Id.* at 2.)  Thus, plaintiff's own exhibits demonstrate GEICO's policy of training representatives to avoid interfering once they become aware of a signed contract between the customer and a non-ARX repair shop.  Plaintiff has come forward with no evidence that GEICO does not adhere to this practice, much less that it instead tries to force the customer to switch to the ARX facility whenever its customer service representatives learn of contractual relations between the customer and a non-ARX shop such as Spectrum.

Because the record and briefing demonstrate that Spectrum has not satisfied several elements of the cause of action, the Court finds that GEICO's Motion for Summary Judgment is properly **granted** as to plaintiff's claim of tortious interference with contractual relations.[25]

### B. Tortious Interference with Business Relations.

Spectrum's alternative theory of liability sounds in tortious interference with business relations. "Under Alabama law, the tort of wrongful interference with a business relationship has five elements: (1) the existence of a protected business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1302 (11th Cir. 2010); *see also White Sands Group, L.L.C. v. PRS II, LLC*, 32 So.3d 5, 14 (Ala. 2009) ("*White Sands II*") (same).[26] As grounds for its summary judgment motion, GEICO challenges the existence of genuine issues of material fact as to many of these elements.

---

[25]     In addition to the defects in proof of contractual relations, defendant's knowledge of such contractual relations, and wrongful interference, the Court notes that defendant would also be entitled to summary judgment on this claim on the basis of the "stranger" rationale articulated *infra* with respect to the tortious interference with business relationships theory. *See generally Waddell & Reed*, 875 So.2d at 1153 (plaintiff alleging tortious interference with contractual relations must establish that defendant is a stranger to the contract, and "[o]ne is not a *stranger* to the contract just because he is not a *party* to the contract") (citations omitted). Alabama law is clear that "it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." *Tom's Foods, Inc. v. Carn*, 896 So.2d 443, 454 (Ala. 2004) (citing *Parsons v. Aaron*, 849 So.2d 932, 946-47 (Ala. 2002)); *see also McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1261 (11th Cir. 2004) (recognizing that defendant's status as a non-party to the relationship is an element of tortious interference claim under Alabama law). The reason for this limitation on the tort is that a party to a contract cannot, in law or logic, be deemed to be interfering with it. *See Tom's Foods*, 896 So.2d at 454 (citations omitted). Thus, Alabama courts require a plaintiff asserting a tortious interference claim to prove that "the defendant is a 'third party' or a 'stranger' to the contract or business relationship with which the defendant allegedly interfered." *Waddell & Reed*, 875 So.2d at 1154. Because the Court concludes *infra* that GEICO is not a stranger to the business relationships between Spectrum and GEICO customers, it is likewise not a stranger to any contracts that may exist between them for the same reasons.

[26]     In Alabama, the absence of a contractual relationship does not cut off a plaintiff's right to recover for tortious interference with a protectable business relationship. *See, e.g., White Sands I*, 998 So.2d at 1054 ("the absence of a valid contract is not fatal to [a] claim of tortious interference with a business relationship"); *see also White Sands II*, 32 So.3d at 14-15 (explaining that even without a contract, "protection is appropriate against improper interference (Continued)

-17-

The analysis of this cause of action turns on the "stranger" requirement. The Alabama Supreme Court recently confirmed that one element of the tort of the tortious interference with a business relationship which a plaintiff must prove "is that the defendant be a *stranger* to the relationship." *White Sands II*, 32 So.3d at 14; *see also Edwards*, 602 F.3d at 1302 (plaintiff has burden "to establish … that the defendant was a stranger to the protected business relationship with which the defendant interfered," and not "a party in interest to the allegedly injured business relationship"). GEICO asserts that it cannot be liable for tortiously interfering with Spectrum's customer relationships because GEICO, as payor for services provided by Spectrum to its customers on GEICO-insured repairs, has a *bona fide* beneficial or economic interest in those relationships. In GEICO's words, "Because GEICO must indemnify Spectrum's customers for the repairs Spectrum performs, GEICO has an economic interest in the relationship between Spectrum and those customers who make a claim with GEICO. Thus, Spectrum's relationship with its customers is interwoven with GEICO's relationship, as payor, with its customers that make automobile claims." (Doc. 78, at 29-30.)

There is considerable support for GEICO's position in authorities applying Alabama law. For tortious interference purposes, "a defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship." *Edwards*, 602 F.3d at 1302 (quoting *Tom's Foods, Inc. v. Carn*, 896 So.2d 443, 454 (Ala. 2004)); *see also Waddell & Reed*, 875 So.2d at 1154 (same). "When the defendant is an essential party to the allegedly injured business relationship, the defendant is a participant in that relationship instead of a stranger to it." *Edwards*, 602 F.3d at 1302 (citations omitted); *see also MAC East*, 535 F.3d at 1297 (under Alabama law, "[a] defendant is not a stranger to a contract or business relationship when (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; … or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract or relations") (citations omitted). Thus, for example, the Eleventh Circuit in *Edwards* found that a restaurant was not a stranger to the

---

with reasonable expectancies of commercial relations" because "[i]t is the right to do business in a fair setting that is protected") (citations omitted).

business relationships between its customers and serving staff because the restaurant "had an obvious economic interest in" those relationships and was "involved in creating those relationships." *Edwards*, 602 F.3d at 1303; *see also Ex parte Blue Cross and Blue Shield of Alabama*, 773 So.2d 475, 480 (Ala. 2000) (health insurer was not a stranger to contractual arrangements between dentist and patients, where insurer was to pay for services provided by dentist to patients, such that "[i]nterdependent contractual relations existed" among them all). The logic from *Edwards* and *Blue Cross* supports GEICO's analogous position that it is not a stranger to the business relationships at issue here. After all, GEICO is paying the claims for the repair of the customer's vehicle. This gives GEICO an obvious economic interest in the relationship between customer and body shop; moreover, GEICO is essential to the formation and perpetuation of that relationship because without GEICO's promise of indemnification, many customers would forego repairs of body damage altogether.[27] Just as the relationship among health insurer, dentist and patient is interwoven and interrelated, so too appears the relationship among auto insurer, collision center and customer. In each case, the insurer has a direct economic interest in the vendor/customer relationship, by virtue of its status as financier of the transaction, and all three entities' relationships are bound up in each other.

Confronted with this compelling argument, Spectrum's initial response is that GEICO does not actually have an interest in the Spectrum/customer relationship because GEICO is attempting to force the customer to use the ARX shop (not Spectrum) to complete the repairs. In addition to being inconsistent with much of its own evidence (which shows that GEICO did nothing more than require Spectrum customers to transport their vehicles for the ARX shop for inspections, while assuring them of their right to choose whatever shop they wish to perform the work), Spectrum's argument does not make sense. It cannot reasonably dispute that GEICO has a direct financial obligation to pay for its customers' collision repair work. That obligation

---

[27] This reality is underscored by the testimony of Spectrum principal John Kirby. When asked how much of Spectrum's business is non-insurance, the witness responded, "Not much. Very, very little. Very, very little." (J. Kirby Dep., at 369.) The point is that, without an insurer to foot the bill, in many cases there can be no relationship between customer and body shop. Thus, GEICO facilitates, enables, and effectively creates the business relationships between Spectrum and its customers by paying for the repairs, and Spectrum and its customer are dependent on GEICO's relations with them as a catalyst for and an enabler of their relationship. As such, GEICO cannot rationally be viewed as an outsider to those relationships.

remains intact whether the vendor is Spectrum, the designated ARX shop, or some third party shop. As such, whatever shop its customer does business with, that customer/vendor relationship is bound up in, and intertwined with, the customer's relationship with GEICO and, for that matter, the shop's relationship with GEICO. No matter who the selected shop is, GEICO is footing the bill; therefore, GEICO is an essential entity to the customer/collision center relationship, the very relationship with which Spectrum claims interference. Given this inescapable fact, there is simply no reasonable way to view GEICO as a stranger to the business relations at issue here.[28]

This result is hardly novel in the case law. Indeed, the Court's research reflects that auto repair facilities' tortious interference claims against insurance carriers in other jurisdictions on theories akin to Spectrum's have fared poorly because courts have deemed the insurer not to be a "stranger" to the business relationships at issue. Just last year, in *Hernandez Auto Painting and Body Works, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2009 WL 2952066 (S.D. Ga. Sept. 14, 2009), the plaintiff auto repair shop alleged that the defendant insurer systematically steered customers away from plaintiff's shop to other shops with lower labor charges. The Southern District of Georgia dismissed the *Hernandez* plaintiff's tortious interference claim on the ground that the insurer was not a stranger to the business relationship at issue, concluding as follows: "Plaintiff contends defendant has interfered in its insured's choice of repair facility in situations where Defendant is obligated to pay the cost of the repair. … Plaintiff cannot seriously contend that Defendant has no economic interest in this transaction or the parties to it – Defendant is *financing* the transaction." *Id.* at *2; *see also Gunder's Auto Center v. State Farm Ins.*, 617 F. Supp.2d 1222, 1224-25 (M.D. Fla. 2009) (auto repair shop's tortious interference claim against

---

[28]     Plaintiff's strained argument to the contrary flows from the questionable premise that GEICO does not want to do business with Spectrum. (Doc. 92, at 24.) Even assuming that to be correct, what GEICO wants or does not want is irrelevant. The fact of the matter is that Spectrum is claiming a protectable business interest as to GEICO customers. Whatever relationship Spectrum may have with those customers, GEICO is inextricably intertwined in it, irrespective of GEICO's preferences. Stated differently, it is impossible for Spectrum to have a relationship with a GEICO customer for a repair job without also having a relationship with GEICO itself, just as it is impossible for a GEICO customer to have a relationship with Spectrum for GEICO-insured repairs on a vehicle without also having a relationship with GEICO. For that reason, GEICO is not, and cannot be, a stranger or outsider to the business relationship between Spectrum and a GEICO customer.

insurer fails to state a claim, reasoning that "[b]ecause State Farm must indemnify the plaintiff's customer for the repair performed by the plaintiff, State Farm is an interested party in the business relation between the plaintiff and those customers who are State Farm insureds"); *G&C Auto Body Inc v. Geico General Ins. Co.*, 552 F. Supp.2d 1015, 1020 (N.D. Cal. 2008) (in dispute concerning insurer's alleged steering of body shop's customers to other shops, recognizing that "GEICO is not a stranger to the relationship between G & C and its policyholders," though California law on "stranger" issue differs materially from Alabama's); *Federal Auto Body Works, Inc. v. Aetna Cas. & Sur. Co.*, 447 A.2d 377, 380 (R.I. 1982) (insurer's alleged interference in body shop's customer relationships during inspection process deemed not actionable on tortious interference theory because "Aetna has a financial interest that it protects by inspecting a damaged vehicle to determine the value of a loss"). These cases buttress and reinforce this Court's determination that Spectrum has failed to meet its burden of showing evidence giving rise to a reasonable inference that GEICO is a stranger to the business relationships between Spectrum and GEICO customers.[29]

As a fallback position, Spectrum asserts that even if GEICO is not a stranger to the subject business relationships, "[t]hat argument cannot be used to insulate a Defendant from inappropriate conduct." (Doc. 92, at 24.) This legal proposition is dubious, at best. Alabama law is quite clear that "a tortious interference claim can be maintained only when the defendant is independent of or a stranger to the relation or contract with which he allegedly interfered." *MAC East*, 535 F.3d at 1297; *see also Tom's Foods*, 896 So.2d at 454 ("it is essential to a claim of tortious interference … that the plaintiff establish that the defendant is … a 'stranger' to the contract") (citations omitted). Indeed, the Alabama Supreme Court recently reiterated in the clearest of terms that "one of the elements is that the defendant be a *stranger* to the relationship." *White Sands II*, 32 So.3d at 14. Plaintiff points to no cases, and the Court is aware of none, in which a plaintiff has been permitted to maintain a tortious interference claim against a non-stranger defendant based on some qualitative assessment of propriety of the defendant's conduct.

---

[29]     Were the law otherwise, insurers would be subject to tortious interference claims for myriad aspects of their claims-handling process whenever either insured or vendor felt that an insurer requirement, request or communication affected it adversely. The fact that insurers work closely with both vendor and insured in the claims-handling process highlights their non-stranger status in that complex, interwoven web of relationships.

Rather, Alabama courts have unambiguously framed the "stranger" requirement as an element of the tort, without which a plaintiff cannot prevail. The Court rejects plaintiff's strained argument to the contrary.

Even if Spectrum were correct that tortious interference is actionable against defendants who are not strangers, so long as they engaged in "inappropriate conduct" (doc. 92, at 24), there is no indication of any pattern of systematic, inappropriate conduct by GEICO towards its customers in this regard. It is surely not inappropriate for GEICO to have an ARX Program or to apprise its customers of the benefits of that program (which involve one-stop shopping, an on-site adjuster to oversee the repairs, on-site rental car facilities, priority service, a lifetime guarantee, and so on), in the interest of maximizing customer satisfaction and utilization. Nor is it inappropriate *per se* for GEICO to pursue the efficiency benefits of having customers bring their vehicles to a single location for inspection, as opposed to more time-consuming field inspections, when circumstances reasonably allow. As these types of conduct are acceptable, plaintiff's allegations of inappropriate conduct hinge largely on the theory that customers were forced or manipulated by GEICO to give business to the ARX shop over the shop of their choice. But most of plaintiff's own witnesses say only that GEICO asked or required them to bring their vehicles to Cockrell's for inspection, while acknowledging and honoring their right to have their vehicles repaired wherever they want. Plaintiff identifies only two witnesses (Brown and Deas) who were told by GEICO representatives that they had to repair their cars at Cockrell's. This conduct may be inappropriate, but it is also isolated and contrary to GEICO's training materials (which require, among other things, that GEICO representatives always tell customers of their right to choose the body shop of their choice and provide customers with all necessary information to make an educated decision as to the ARX Program) and the testimony of GEICO officials stressing the primacy of the customer's right to utilize the collision center of his or her choice for repairs. Plaintiff simply has not come forward with evidence showing a pattern of inappropriate interference by GEICO with Spectrum's business relationships with its customers; therefore, defendant is entitled to summary judgment on that basis as well, separate and apart from the "stranger" requirement.[30]

---

[30] Spectrum's summary judgment brief exaggerates and distorts the record facts about GEICO's conduct to suit its rhetorical purposes. For example, Spectrum protests that the
(Continued)

In short, the Court finds that defendant is entitled to summary judgment on the tortious interference with business relationships cause of action because plaintiff has failed to meet its burden of showing that GEICO was a stranger to the relationships with which it allegedly interfered. Moreover, the evidence of interference on which plaintiff's claim hinges consists in large part of such non-sinister conduct as GEICO merely instructing customers to take their vehicles to an ARX shop for inspection and explaining to them the benefits of the ARX Program, none of which amounts to inappropriate interference. This is particularly so given plaintiff's failure to identify a single customer who switched from Spectrum to the ARX shop based on that type of alleged conduct.[31]

---

drive-by inspection requirement amounts to "manufactured inconvenience and delay" and "delays Spectrum's repairs and cause[s] the inconvenience, conversion and theft of its customers." (Doc. 92, at 3, 22.) But Spectrum does not point to a single customer who selected Cockrell's over Spectrum to perform the repairs simply because GEICO required the customer to take the car to Cockrell's for inspection. In fact, most of plaintiff's witnesses say they had their cars repaired at Spectrum, notwithstanding the Cockrell's inspection. These facts are inconsistent with plaintiff's shrill complaints of wholesale "conversion and theft of its customers." If plaintiff cannot find a single customer who would have gone to Spectrum if not for the inconvenience of the Cockrell's inspection location, then it appears that Spectrum greatly overstates the effect of this requirement. Plaintiff says that "Geico will not take no for an answer" (doc. 92, at 15), ignoring its own witnesses, most of whom did say no to the ARX Program and had their cars repaired at Spectrum. Next, Spectrum balks that "Geico has refused to pay Spectrum's bills" (doc. 92, at 25), without pointing to any record citations to support that fact, much less relating it to the ARX Program at issue today. Spectrum also accuses GEICO of "tell[ing] Spectrum's customers that they will receive no warranty or guarantee for their repair unless it is done at Geico's ARX shop." (*Id.*) This is an improper distortion of the cited evidence, which consists of (i) the testimony of GEICO representative Richard McAleer that "I don't feel that I really said anything that would have done anything like that" when asked if he had told a customer that "the only way her vehicle would be warranted is if it was repaired at the ARX shop" (McAleer Dep., at 23); and (ii) a GEICO script that if a customer says he or she wants to use a non-ARX shop to do the repairs, the representative should respond, "remember that, unfortunately, we are not able to guarantee the repairs at that particular shop." (Pl. Exh. 24.) These exhibits do not support the proposition for which plaintiff cites them, and plaintiff does not advance its position by taking unwarranted liberties with the facts. In much the same vein is plaintiff's assertion that GEICO "misrepresent[ed] facts in furtherance of its threats to take away Spectrum's Geico insured repair business." (Doc. 92, at 25.) This accusation is vague and unsupported by the record.

[31] The circumstances of Brown and Deas appear too isolated and contrary to GEICO's own training protocols and its officials' expectations and explanation of the ARX (Continued)

### C.     Injunctive Relief Cause of Action.

Plaintiff's only remaining cause of action is styled "Injunctive Relief," and requests preliminary and permanent injunctive relief as a remedy for GEICO's alleged tortious interference.  (Doc. 1-1, ¶¶ 26-30.)  This claim is not a freestanding cause of action in its own right, but is entirely derivative of GEICO's substantive claims.  *See Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. There is no such thing as a suit for a traditional injunction in the abstract.") (citations and internal quotation marks omitted); *Sierra Club v. Tennessee Valley Authority*, 592 F. Supp.2d 1357, 1374-75 (N.D. Ala. 2009) (recognizing that injunction requires infringement of a legal right).  Spectrum expressly agrees that if its claims for tortious interference fail, then "any request for injunctive relief is to be denied as a matter of law." (Doc. 92, at 29.)  That is precisely the case here.  The Court having found that GEICO is entitled to summary judgment on the substantive causes of action of tortious interference with contractual and business relationships, summary judgment is likewise warranted in GEICO's favor on Spectrum's claim for injunctive relief, which hinges in its entirety on the premise that an injunction should be entered as a remedy for the tortious interference counts being dismissed on summary judgment.

## IV.     Conclusion.

Plaintiff's tortious interference claims are a classic example of attempting to fit a square peg into a round hole.  The docket sheet and record reflect that plaintiff is upset about various of defendant's business practices which plaintiff perceives as unfair.  But not every unfair act equates to liability.  In one telling passage of its summary judgment brief, plaintiff decries the lack of availability of remedy under the Alabama Insurance Code or the Alabama Deceptive Trade Practices Act, and explains that "[t]he tort of interference is the only mechanism Spectrum has" to combat the alleged unfairness.  (Doc. 92, at 25.)  But the purported absence of any other

---

Program to support the viability of a tortious interference cause of action across a broad base of customers and potential customers.  These incidents appear to be outliers, and not the kind of pattern of conduct that might support Spectrum's tortious interference claims, which are predicated on allegations of broad-based interference with its customers.

recourse does not mean that plaintiff's chosen claims have merit, or that they fit the facts and circumstances about which plaintiff complains. Plaintiff's summary judgment argument is long on inflammatory rhetoric (*i.e.*, use of terms like "predatory," "theft," "steal," and "unethical" to describe GEICO's program), and short on evidence establishing genuine issues of material fact as to fundamental elements of tortious interference under Alabama law.

Simply put, plaintiff has not shown that defendant was aware of, or interfered with, any valid, enforceable contracts between plaintiff and its customers. Plaintiff has not shown that defendant was a stranger to the contractual and business relationships at issue. And the vast majority of the interference about which plaintiff complains consists of benign conduct (*i.e.*, having customers take their car to a third-party location for inspection, telling customers about the advantages of the ARX Program) that falls well short of tortious interference, as a matter of law. Despite interviewing and/or deposing numerous witnesses and conducting comprehensive discovery, plaintiff has identified only two customers whose business plaintiff lost because of alleged misrepresentations by defendant's customer service representatives (which misrepresentations, if made, were contrary to their training and defendant officials' explanation of how the program was designed to work).

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 77) is **granted**, and all remaining claims in this action are **dismissed with prejudice**. In light of this ruling, plaintiff's pending Motion for Preliminary Injunction (doc. 74) is **moot**.

A separate judgment will enter.


DONE and ORDERED this 29th day of September, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE